# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-2920

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Glenn Robert Becker, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted:  February 12, 2003

Filed:  June 20, 2003

_____

Before BOWMAN, MORRIS SHEPPARD ARNOLD, and BYE, Circuit Judges.

_____

BOWMAN, Circuit Judge.

Glenn Robert Becker filed a motion to suppress evidence discovered during a traffic stop, alleging that he did not voluntarily consent to the search of his person during the detention.  The District Court[1] denied the motion and Becker appeals.  We affirm.

_____

[1]The Honorable Michael J. Melloy, United States District Court Judge for the Northern District of Iowa.  Judge Melloy has since been appointed United States Circuit Judge for the Eighth Circuit and currently serves in that capacity.

I.

On February 16, 2001, Officer Sabers of the Dubuque, Iowa, police department responded to a call concerning a domestic disturbance at 1029 Judy Court. According to the call, a man was attempting to kick in the front door of the residence. Shortly thereafter, police stopped Becker's vehicle a half mile from the residence because it matched the description given in a report about the disturbance. Officer Fairchild and another police officer obtained routine information from Becker and told him that he was going to be detained until they determined what happened at the Judy Court residence. Fairchild patted Becker down for weapons and felt a small metal box in Becker's shirt pocket. Fairchild did not ask to see the box and told Becker to be seated in the back of the police car. Deputy Schneider arrived at the scene later and asked Becker whether he could search his vehicle. Becker refused the request and told Schneider to get a search warrant if he wanted to search Becker's car.

Meanwhile, Sabers completed his interview with the residents of 1029 Judy Court, who decided that they did not wish to press charges against Becker. Sabers then went to the location where Becker had been stopped and told State Trooper Olmstead, who arrived at the scene sometime after the investigative stop was initiated, that they should get a certified drug recognition expert to determine whether Becker was under the influence of any controlled substance. Dubuque law enforcement authorities knew Becker had problems with controlled substances. Olmstead stated he was a certified drug recognition expert. After conferring with Fairchild, Olmstead asked Becker if he objected to another pat-down search. Becker gave his consent. During the search, Olmstead felt the metal box in Becker's shirt pocket and asked if he could remove it. Becker said yes. The box was an Altoids tin with black electrical tape securing the lid. Olmstead then asked Becker if he would consent to a search of the box. Becker again gave his consent. After opening the box, Olmstead saw a clear plastic bag containing white powder and a short straw. When asked what was inside the container, Becker replied that the white powder was

"meth." The officers arrested Becker for possession of methamphetamine. Becker's arrest occurred approximately forty-nine minutes after the initial stop. Following his arrest, officers performed a field sobriety test at the police station, which was negative for alcohol or drug intoxication.

A Magistrate Judge held a hearing on Becker's motion to suppress and later issued a report and recommendation, advising that the District Court grant Becker's motion to suppress. The Magistrate Judge found that although the initial stop of Becker was constitutionally permissible, Becker should have been released once the police officers decided not to arrest him for the domestic disturbance call. Accordingly, the Magistrate Judge recommended that any evidence seized or statements made by Becker after that time be suppressed. The District Court adopted the Magistrate Judge's findings of fact and agreed with the Magistrate Judge that Becker should have been released at the point the officers decided not to arrest him for the domestic disturbance. Nonetheless, the District Court denied the motion to suppress because it found that Becker voluntarily consented to the pat-down search and the search of the container found in his pocket. Thus, Becker's voluntary consent to the search purged any taint of his unlawful detention.

Based on Becker's conditional plea of guilty, he was sentenced to 132 months of imprisonment for manufacture of methamphetamine and for being a felon in possession of a firearm. This appeal followed.

II.

On appeal, Becker argues the District Court erred in finding that he voluntarily consented to the search of his person during his unlawful detention following the

traffic stop.[2] We review for clear error a district court's finding of consent to a search and review de novo a district court's determinations of law, including the conclusion that a suspect's Fourth Amendment rights were not violated. United States v. Zamoran-Coronel, 231 F.3d 466, 468 (8th Cir. 2000).

In this case, we must first determine if Becker voluntarily gave his consent to the search. See id. The government bears the burden of proving, by a preponderance of the evidence, that Becker's consent to the search was given freely and without coercion. See United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001). Becker's awareness of his right to refuse is not necessary, however, for his consent to be voluntary. Id.; see also Schneckloth v. Bustamonte, 412 U.S. 218, 231 (1973). Rather, in determining whether Becker's consent was sufficiently voluntary to purge the taint of his illegal detention, we look at the totality of the circumstances. See Smith, 260 F.3d at 924. The District Court followed our guidance and applied several factors to determine whether Becker's consent to the search of his person was voluntary. See United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990) (stating factors for finding voluntary consent to a search of the person). Those factors include individual characteristics such as Becker's age and educational level, his knowledge of his Miranda[3] rights, and whether he was under the influence of alcohol or narcotics when consent was given, as well as external factors including the length of his detention, any evidence of intimidation or promises by police, his custodial or arrest

---

[2]For purposes of this appeal, we assume, although it might not necessarily be the case, that Becker's continued detention after Sabers arrived at the scene was unlawful. See United States v. Watts, 7 F.3d 122, 126 (8th Cir. 1993) ("The mere fact that the officers' original ground for stopping [a suspect] dissipated does not prevent them from continuing their investigative stop based on new facts creating a reasonable articulable suspicion of criminal activity,"), cert. denied, 510 U.S. 1078 (1994).

[3]Miranda v. Arizona, 384 U.S. 436 (1966).

-4-

status at the time consent was given, where the consent was given, and whether he was silent during the search. See id.

We agree with the District Court's finding that Becker's consent to the search was voluntarily given. Becker was thirty-nine years old, he had attended high school and received his GED, and he was not under the influence of narcotics or alcohol at the time of his arrest. The encounter occurred in daylight hours on a city street. In addition, there is no evidence that the police officers threatened Becker or made any promises or misrepresentations to him. He was not handcuffed and, given the circumstances, his detention was brief. Becker was lawfully detained for approximately half an hour when Olmstead requested his consent for the pat-down search, and he was arrested only nineteen minutes after that search. Most importantly, Becker was aware of his rights. Although Becker was not informed of his right to refuse consent to the search, he did have prior experience with law enforcement and actually declined Schneider's request to search his vehicle shortly before he gave consent for the pat-down search. Olmstead was aware of this prior exchange when he asked Becker if he would consent to a search of his person. During the search, Becker consented not only to the pat-down search, but also to the removal of the container from his shirt pocket and the opening of that container. See United States v. Moreno, 280 F.3d 898, 901 (8th Cir. 2002) (noting that "the record is replete with evidence" that suspect voluntarily and repeatedly consented to the search). At no time did Becker object to Olmstead's requests. Considering all of these factors, we conclude that the District Court's finding that Becker voluntarily consented to the search was not clearly erroneous.

Although we agree with the District Court that Becker voluntarily consented to the search, that is not the end of our inquiry. Even if Becker's consent to the search was voluntary, we must also consider, for purposes of the Fourth Amendment, whether Becker's consent was given in circumstances that render it an independent, lawful cause of Olmstead's discovery of the methamphetamine. See Moreno, 280

F.3d at 900; see also United States v. Yousif, 308 F.3d 820, 833 (8th Cir. 2002) (Arnold, Judge M. S., dissenting) (noting that our "more expansive discussions" on voluntary consent recognize "two distinct issues, namely, whether the consent to search was voluntary, and, if so, whether that consent was given in circumstances that render it an independent, lawful cause of the discovery of the relevant evidence."). This second inquiry, which the District Court did not perform, is necessary because voluntary consent to a search, preceded by an illegal police action, does not automatically purge the taint of an illegal detention. In determining whether the taint is purged from the evidence seized during the allegedly unlawful detention, we consider the following factors: (1) the temporal proximity between the illegal search or seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. See Brown v. Illinois, 422 U.S. 590, 603–04 (1975); see also Moreno, 280 F.3d at 900 (applying the Brown factors)).[4]

We first turn to the temporal proximity of Becker's unlawful detention and his consent to the search. Police officers stopped Becker on suspicion of being involved in a domestic disturbance, and he was lawfully detained for half an hour while Sabers investigated that complaint. When Sabers arrived on the scene, Olmstead asked Becker if he would consent to a pat-down search. Becker's arrest came nineteen minutes after Sabers arrived at the scene. Based on these facts, we cannot say that Becker's consent was too close in time to the moment when his detention became unlawful. See United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994) (finding consent voluntary under Brown factors — despite the fact that the request for consent

---

[4]We note that some of our previous decisions do not specifically apply the Brown factors to determine whether the taint of a prior illegal search or seizure has dissipated. See, e.g., United States v. Beason, 220 F.3d 964, 967 (8th Cir. 2000). Other decisions, including one last year, however, continue to apply each of the Brown factors as well as appearing to require that consent to the search be given voluntarily. See, e.g., Moreno, 280 F.3d at 900–01. We think that is the better course.

followed immediately upon the Fourth Amendment violation), cert. denied, 514 U.S. 1134 (1995).

We next consider whether there were any intervening circumstances that purge the taint of Becker's unlawful detention. These intervening circumstances can include, among others, telling a suspect he may refuse to consent to a search. Moreno, 280 F.3d at 901 (holding that advising a suspect of his right to refuse consent to search is an intervening circumstance that supports the voluntariness of consent). In this case, Becker was not advised that he could refuse consent (although the record reflects Becker was certainly aware of this right). Nonetheless, we think the concern expressed by the officers at the scene about whether Becker was under the influence of narcotics is a sufficient intervening circumstance to purge the taint of Becker's unlawful detention. Becker was known to local law enforcement officials to be involved in narcotics. Given the allegations concerning his behavior at the Judy Court residence, the officers were justified in seeking to determine whether Becker was under the influence of any narcotics before he got back behind the wheel.

Similarly, turning to the last Brown factor, we find no purposeful violation of Becker's constitutional rights in his continued detention after Sabers arrived on the scene from the Judy Court residence. Police officers on the scene of the investigative stop were concerned as to whether Becker was under the influence of narcotics. Contrary to Becker's argument, the administration of a sobriety test at the station after Becker's arrest for possession of methamphetamine appears to us to undercut, rather than support, his claim that the police officers acted in bad faith. In short, the record simply does not support any inference of flagrant misconduct on the part of law-enforcement officials in continuing to detain Becker, an individual known to local law enforcement for his involvement with narcotics.

For the foregoing reasons, the District Court did not err in denying Becker's motion to suppress evidence. The judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.